**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CANDACE MARTINEZ,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 5:26-CV-00117-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Candace Martinez challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Jan. 16, 2026). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #3). For the reasons below, I **AFFIRM** the Commissioner's decision denying DIB.

## PROCEDURAL BACKGROUND

Ms. Martinez applied for DIB on September 6, 2023, alleging she became disabled on March 4, 2023. (Tr. 307). After her claim was denied initially and on reconsideration, Ms. Martinez requested a hearing before an Administrative Law Judge. (Tr. 191, 192, 216). On October 17, 2024, Ms. Martinez (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 41-75). On October 25, 2024, the ALJ determined Ms. Martinez was not disabled. (Tr. 27-36). On November 17, 2025, the Appeals Council denied the request to review

the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 8-10; *see also* 20 C.F.R. § 404.981). Ms. Martinez then timely filed this action. (ECF #1).

## FACTUAL BACKGROUND

### I. Personal and Vocational Evidence

Ms. Martinez was 30 years old on her alleged onset date and 32 years old at the hearing. (*See* Tr. 184). She completed high school and has worked in a composite job of stock clerk and cashier-checker and a department supervisor. (Tr. 352, 51, 67).

### II. Medical Evidence

Ms. Martinez suffers several interrelated conditions that cause her to faint suddenly. First, she is diagnosed with postural orthostatic tachycardia syndrome, a condition that causes the heart to beat quicker when standing up or lying down. (Tr. 623). She also is diagnosed with orthostatic hypotension, a condition where her blood pressure suddenly drops when she stands or sits. (*See, e.g.*, Tr. 549). The drop in blood pressure can also cause syncope, *i.e.*, fainting. (*Id.*). Her doctors suspect it is "likely due to autonomic dysfunction," a nervous disorder disrupting various automatic body processes like heartbeat and blood pressure regulation. (*Id.*).

She presented to a cardiologist in February 2023 complaining of recurrent episodes of dizziness. (Tr. 448). She reported symptoms consistent with vertigo, but not brought on by rapid movement, as well as shortness of breath and lightheadedness that is relieved by sitting or lying down. (*Id.*). She denied fainting, heart palpitations, or chest pains. (*Id.*). She recounted these episodes of dizziness started about a year prior but had increased recently in frequency and intensity. (*Id.*). A physical examination found a normal heart rate and rhythm, no murmur, normal pulmonary effort, normal breath sounds, no wheezing, and normal range of motion. (Tr. 449-50).

The cardiologist recommended additional testing because of Ms. Martinez's unusual symptoms and her electrocardiogram "showed some baseline ST segment abnormalities." (Tr. 452).

Ms. Martinez returned to her cardiologist at the end of February after fainting during dinner. (Tr. 454). She also reported intermittent episodes of increased chest pressure, chest fullness, and abdominal fullness. (*Id.*). A physical examination noted chest pains, palpitations, and shortness of breath. (Tr. 455). Her echocardiogram was normal, her event monitor did not show extreme heart rates, her laboratory tests were unremarkable, her chest x-ray was normal, and there was no evidence of heart failure. (Tr. 454).

In April 2023, Ms. Martinez underwent a neurological evaluation. (Tr. 465-69). The neurologist noted a CT scan of Ms. Martinez's brain was performed in March looking for a possible neurological cause, but it was unremarkable and the heart monitor did not show any cardiac cause of her symptoms. (Tr. 466). The neurological examination was "completely normal." (Tr. 468). The neurologist noted Ms. Martinez's symptoms could be related to autonomic dysfunction, but they did not seem to be primarily neurological. (*Id.*). The neurologist recommended hydration, compression stockings, and tilt-table testing.[1] (*Id.*).

Ms. Martinez followed up with her cardiologist in June 2023 after her tilt-table test that was "positive for a combined vasodepressive and cardiodepressant response." (Tr. 545). The cardiologist assessed Ms. Martinez had "marked orthostatic hypotension likely due to autonomic dysfunction." (Tr. 549). She trialed several medications, but tolerated none of them. (Tr. 545). She

---

[1] A tilt-table test is used to determine why a person has fainting episodes and involves the person lying flat on a padded table that is quickly rotated to an upright position. *See Tilt Table Test*, *Cleveland Clinic*, http://my.clevelandclinic.org/health/diagnostics/17043-tilt-table-test (last accessed Nov. 24, 2026).

was "somewhat" able to manage with support socks and drinking pickle or olive juice to increase her sodium intake. (*Id.*). She was referred to an endocrinologist to evaluate a possible hormonal cause. (Tr. 549).

In September, Ms. Martinez followed up with her cardiologist complaining of continued fainting, including once while gardening. (Tr. 539). Her cardiologist assessed "recurrent syncopal events due to marked autonomic dysfunction as documented by markedly abnormal tilt table test." (Tr. 543). Her cardiologist also noted the endocrinologic evaluation was negative, though she still suspected some endocrine dysfunction. (*Id.*). Further testing was ordered to rule out other potential causes. (*Id.*).

In December 2023, Ms. Martinez was evaluated at the Cleveland Clinic Center for Neuromuscular Medicine while she was nine weeks pregnant. (Tr. 482-86). She reported fainting episodes as well as experiencing pre-fainting symptoms including feeling hot, lightheaded, and sweaty. (Tr. 482, 486). After each episode, her blood pressure is typically low. (Tr. 486). A physical examination noted reduced reflexes but intact sensation and gait. (*See* Tr. 484-86). She was diagnosed with orthostatic intolerance and transient loss of consciousness and recommended to wear compression socks and increase her fluid and salt intake. (Tr. 486-87).

Ms. Martinez also followed up with her cardiologist in December 2023. (Tr. 533-37). She continued to feel dizzy and lightheaded and reported taking sodium tablets. (Tr. 533). Her cardiologist noted her blood pressure had "somewhat increased and stabilized" over her pregnancy. (*Id.*). Her cardiologist did not recommend any additional testing or medication changes at that time and speculated if her symptoms were related to hormonal issues, they may potentially improve during her pregnancy. (Tr. 537).

In January 2024, Ms. Martinez went to the emergency room after waking up feeling clammy, cold, dehydrated, and, after checking, low blood pressure. (Tr. 615-16). She denied headaches, weakness, dizziness, lightheadedness, chest pain, or shortness of breath. (Tr. 616). On examination, she was in no acute distress and displayed normal cardiovascular and pulmonary findings. (Tr. 619-20). On examination, her blood pressure was 123/79, and she reported waking up with a blood pressure of 85/56. (*Compare* Tr. 619 *with* Tr. 615). She was discharged after receiving intravenous fluids and a bedside fetal ultrasound. (Tr. 622).

In March 2024, Ms. Martinez followed up with the Neuromuscular Center. (Tr. 506-08). She could not undergo further tilt-table testing during her pregnancy. (Tr. 506). She was advised to continue with "supportive measures" of increasing her fluid and salt intake and wearing compression socks and to follow up after delivery. (Tr. 506, 508).

Ms. Martinez also followed up with her cardiologist in March 2024 complaining of frequent episodes of lightheadedness and orthostatic hypotension. (Tr. 527-32). She regularly took sodium chloride tablets, though staggered to avoid nausea, and drank large amounts of pickle and olive juice to increase her salt intake; she reported difficulty wearing long compression socks. (Tr. 527). Prescription medications were inadvisable due to her pregnancy. (Tr. 531). Her cardiologist suspected her pregnancy may have worsened her symptoms. (*Id.*). Her dosage of sodium chloride was increased to six grams three times a day and she was switched to shorter compression socks. (*Id.*).

In May 2024, Ms. Martinez returned to her cardiologist and reported being largely bedbound due to her symptoms. (Tr. 521-26). At the time, she was 31 weeks pregnant. (Tr. 521). She reported dizziness, near fainting, lightheadedness, shortness of breath, chest pain, palpitations

and occasional swelling in her face, fingers, and legs. (Tr. 523). A physical examination noted a normal range of motion, normal pulmonary effort, normal breath sounds, and normal cardiovascular findings. (Tr. 522-24). Her cardiologist indicated that high sodium intake seemed to stabilize her blood pressure. (Tr. 521). Her cardiologist also indicated her pregnancy had worsened her symptoms and she might resume prescription medications after delivery. (Tr. 525).

In September 2024, Ms. Martinez followed up with her cardiologist after successfully delivering her child. (Tr. 623-28). She reported numbness and tingling in her hands and fingers, dizziness, lightheadedness, shortness of breath, and sweating when standing and sometimes when sitting. (Tr. 623). She was encouraged to exercise, but could not do so for more than 10-to-15 minutes before becoming dizzy and lightheaded. (*Id.*). A physical examination found shortness of breath but no chest tightness; palpitations but no chest pains or swelling; no gait problem; and dizziness, lightheadedness, and numbness. (Tr. 625-26). Her cardiologist assessed "marked autonomic dysfunction with POTS syndrome." (Tr. 623, 627). Her cardiologist was reluctant to add prescription medications while Ms. Martinez was breast feeding. (Tr. 627). Ms. Martinez was prescribed a handicap placard for an indefinite duration and instructed to continue her exercise regimen. (*Id.*).

## III. Opinion Evidence

On February 2, 2024, state agency medical consultant Venkatachala Sreenivas, M.D., reviewed Ms. Martinez's medical records and opined she can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about 6 hours each in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; stoop, kneel and crouch without limitation; occasionally crawl; and must avoid all

exposure to workplace hazards like moving machinery, unprotected heights, or commercial driving. (Tr. 187-88). On reconsideration review on March 29, 2024, state agency medical consultant Carolyn Hildreth, M.D., reviewed updated medical records and affirmed Dr. Sreenivas' findings. (Tr. 195-97).

## IV. Testimonial Evidence

Ms. Martinez explained she cannot work because she cannot stand or walk very far as her blood pressure will drop suddenly and she quickly becomes lightheaded and dizzy and feels as if she will pass out. (Tr. 55). Her blood pressure will drop even while seated, forcing her to lie down after about two or three hours. (Tr. 55, 58). She can stand for about 30 to 60 minutes before her body feels as if it is in a cold sweat. (Tr. 59). She estimates she can walk 10 feet before needing to stop. (*Id.*). She has fallen several times due to these episodes. (Tr. 57). When she feels an episode coming, her husband or daughter help her to sit or lie down. (*Id.*). She can recover if she lies flat for about 20 to 30 minutes. (Tr. 58). She has had an episode at work once and had to leave early. (*Id.*). Her condition also will cause her to lose feeling in her legs and hands. (Tr. 63). She will get a tingly feeling and then drop things. (*Id.*).

Ms. Martinez frequently monitors her blood pressure with a cuff whenever she feels dizzy or lightheaded, from ten to fifteen times a day. (Tr. 56). She is prescribed sodium chloride pills to take six times a day to raise her blood pressure. (Tr. 55). In the months before the hearing, she was limited in the medications she could take when she was pregnant and then breast feeding. (*See* Tr. 55-56). As a side effect, she experiences swelling and water retention in her legs and feet. (Tr. 56). Her doctor also recommends exercising daily as much as she can without putting herself at risk. (*Id.*). She tries to use her elliptical machine at least 10 minutes a day. (Tr. 51). She uses a cane

and a walker to move and balance. (Tr. 59). She was prescribed the walker during a hospital visit and purchased her cane herself. (*Id.*). She uses both every day, both inside and outside the home. (Tr. 62). The one she uses depends on how stable she feels. (*Id.*). She also wears compression stockings. (Tr. 63).

Ms. Martinez lives with her husband and three children. (Tr. 49). She can fold laundry, but only while sitting and she needs her daughter to bring the clothes to her. (*See* Tr. 50). Similarly, she can prepare food, but also only while sitting. (*See id.*). She used to garden but no longer does so because she cannot stand long enough and will pass out even sitting on a stool. (Tr. 64-65). She does not go up or down stairs. (Tr. 51). If she feels an episode coming while doing housework, her husband takes over the task. (*Id.*). Her mother and sister each come once a week to help take care of the house and children. (Tr. 50). She can drive, but when she does, she takes sodium chloride pills and drinks extra caffeinated coffee to raise her blood pressure. (Tr. 51).

## Standard for Disability

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Martinez had not engaged in substantial gainful activity since March 4, 2023, the alleged onset date. (Tr. 29). At Step Two, the ALJ identified "autonomic dysfunction and syncope [with accompanying diagnoses of postural orthostatic tachycardia syndrome ('POTS'), orthostatic hypotension and intolerance, and autonomic dysreflexia]" as severe impairments. (Tr. 29-30). At Step Three, the ALJ found Ms. Martinez's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 30). At Step Four, the ALJ determined Ms. Martinez's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may stand and/or walk, with normal breaks, for up to four hours in an eight-hour workday; the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; the claimant may frequently handle and finger with the bilateral upper extremities; the claimant may occasionally be exposed to heat and humidity, and must avoid all exposure to unprotected heights, dangerous moving mechanical parts, and commercial driving.

(Tr. 30-31). The ALJ found Ms. Martinez could not perform her past relevant work. (Tr. 34). At Step Five, the ALJ determined Ms. Martinez could perform other work, including as an information clerk, marker, or sorter. (Tr. 35). The ALJ also found in the alternative that if Ms. Martinez were limited to sedentary work, she could work as an order clerk, final assembler, and ink printer. (*Id.*). Thus, the ALJ concluded Ms. Martinez was not disabled. (Tr. 36).

## Standard of Review

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the

substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Ms. Martinez argues the ALJ did not properly evaluate her statements about her symptoms under Social Security Ruling 16-3p and 20 C.F.R. § 404.1529. (ECF #6 at PageID 654-56). She also argues the same fault means the finding she can sustain full-time light work lacks substantial evidence and the ALJ did not build an accurate and logical bridge from the evidence to the conclusions about her statements. (*Id.* at PageID 656-58). The Commissioner responds the ALJ considered multiple regulatory factors in analyzing Ms. Martinez's statements—including her treatment, the objective medical evidence, and her daily activities—and substantial evidence supports the ALJ's findings. (ECF #7 at PageID 667-69).

An RFC is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2 (July 2, 1996). A "regular and continuing basis" means eight hours a day, five days a week or an equivalent schedule. *Id.* The ALJ must base the RFC on all relevant evidence in the case record, including reports of daily activities, any medical source statements from acceptable medical sources, and information about the individual's symptoms. *See id.*

In evaluating the claimant's subjective reports of their symptoms, the ALJ must consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. *See* SSR 16-3p, 2017 WL 5180304, at *5-8 (Oct. 25, 2017). The ALJ need not accept a claimant's subjective complaints when they are inconsistent with the evidence. *Id.* at *8. The ALJ also uses the factors outlined in 20 C.F.R. § 404.1529(c)(3) to evaluate the claimant's statements:

1. A claimant's daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005). The ALJ's evaluation of a claimant's statements is entitled to "great weight and deference" where substantial evidence supports it. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

The ALJ analyzed Ms. Martinez's statements as follows:

> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because subjectively reported reduction in blood pressure, has not been objectively reproducible. Orthostatic blood pressures proved normal on testing. The claimant had reported use of prescription therapy addressed to her orthostatic condition in reports to the Agency but two months later conceded to a treating source that she had never attempted such medications. Her pregnancy and breast-feeding regimen have prevented use of prescription therapy since. Treating sources have noted difficulties assessing her symptoms because they occur randomly. "Holter" monitoring proved normal, even through a witnessed episode of syncope. The claimant has reported side effects of use of salt tablets in reports to the Agency but has denied such in reports to treating sources and conceded the ability to circumvent any side effects by the timing of her use. The claimant was prescribed a handicapped placard by her cardiologist but based only on her subjective description of symptoms. The claimant's report of a walker being prescribed at discharge after her caesarean delivery, is not corroborated by the record of that proceeding.

(Tr. 33) (cleaned up).

The ALJ's discussion shows the ALJ compared Ms. Martinez's statements to the objective medical evidence and applied multiple regulatory factors, including her treatment, side effects, and daily activities. *See* SSR 16-3p, 2017 WL 5180304, at *5-8; 20 C.F.R. § 404.1529(c)(3)(i), (iv), (v).

First, the ALJ noted how Ms. Martinez's symptoms were difficult to reproduce in objective medical testing. To be found disabled, there must be "[m]edical signs and laboratory findings" that show "the existence of a medical impairment" and "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b). This evidence is a "useful indicator" in assessing a claimant's statements, but a claimant's statements will not be rejected "solely because the available objective medical evidence does not substantiate your statements." *Id.* § 404.1529(c)(2). Substantial evidence supports the ALJ's conclusion that Ms. Martinez's symptoms were less than fully disabling because her symptoms do not always appear in the physical examinations. (*See* Tr. 449-50 (blood pressure of 128/68 with other normal findings), 523-24 (same with blood pressure 126/78), 619-20 (same with blood pressure 123/79); *but see* Tr. 467-68 (blood pressure 97/72 with otherwise normal findings); 547-48 (same with blood pressure 98/42)). Such inconsistencies are to be expected with Ms. Martinez's condition of sudden drops of blood pressure. *See Brooks*, 531 F.App'x at 641 (noting the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight"). As Ms. Martinez points out, her cardiologist noted a "markedly abnormal tilt table test," suggesting her symptoms could be reproduced. (Tr. 543). Based on that characterization, Ms. Martinez also argues the ALJ wrongly found the tilt-table test "nominally positive." (ECF #6 at PageID 656). However, the ALJ wrote "'Tilt-table' testing was nominally positive; however, administration of nitroglycerine during the test invalidated the result." (Tr. 31). Ms. Martinez seems to read the ALJ finding the tilt-table test was "nominally positive" to mean the ALJ found the test was "good," *i.e.*, it did not show symptoms. But the ALJ's full sentence reveals the ALJ found the test was "nominally positive" meaning the test reproduced her symptoms, but that result was invalidated because Ms. Martinez

received nitroglycerin. (Tr. 31; *see also* Tr. 483). Substantial evidence supports the ALJ's finding as multiple treatment notes reference nitroglycerin can create a false positive in a tilt-table test. (*See, e.g.*, Tr. 486 ("patient was given nitroglycerin during tilt, discussed how this can skew results"); 506 (same)). As a result, the ALJ discounted her statements based on the lack of medical signs and laboratory findings, but did not end the inquiry.

The ALJ then considered Ms. Martinez's medication and any side effects. The medication and non-medication treatment, together with any side effects, are relevant considerations in assessing a claimant's statements about symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(v). The ALJ noted Ms. Martinez had reported in a disability report she took prescription medication but also reported in a treatment note that she had not taken prescription medication. (Tr. 33) (citing Tr. 353 (listing prescription medications) and Tr. 484 ("Prior Medications for orthostatic condition: None"). The overall record shows Ms. Martinez had trialed several medications but did not tolerate them (Tr. 545) and could not trial other medications after becoming pregnant and later began breast feeding (Tr. 537, 531, 627) though her cardiologist hoped to trial medications in the future (Tr. 525). Additionally, as the ALJ noted, Ms. Martinez takes sodium pills that cause some side effects, but she can control those by timing her doses. (*See* Tr. 365, 381, 64, 527).

The ALJ separately discussed Ms. Martinez's daily activities, a relevant consideration under SSR 16-3p and 20 C.F.R. § 404.1529(c)(3)(i). The ALJ found in a separate paragraph that:

> At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: the claimant attends to her personal care, engages in child rearing activities for two young children and a newborn, she prepares meals, launders clothing, drives, shops, manages medications, finances, appointments, and an e-mail account, spends time with others regularly, in person and across several social media platforms. She attends church, uses a stationary bike daily for thirty minutes and uses an elliptical trainer for

> exercise. In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

(Tr. 32-33) (citations omitted). As the court reads the ALJ's decision as a whole and with common sense, this paragraph is also a part of the ALJ's analysis of Ms. Martinez's statements. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F.App'x 674, 678-79 (7th Cir. 2010).

Ms. Martinez argues the ALJ wrongly found her raising two children and doing household chores inconsistent with her statements of disabling symptoms because her mother and sister each help her in those tasks. (ECF #6 at PageID 656). True, an ALJ's analysis of a claimant's statements must be "reasonable and supported by substantial evidence." *See Jones*, 336 F.3d at 476. But "a Plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ." *Zingale v. Kijakazi*, No. 1:20-cv-2197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022). This is so because the ALJ need not accept a claimant's subjective complaints; the ALJ may discount subjective testimony that is inconsistent with the record evidence. *Jones*, 336 F.3d at 475-76. It remains "for the [ALJ], not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F.App'x 165, 171 (6th Cir. 2020). Ms. Martinez's argument that her caregiving and housekeeping are consistent with disability (as opposed to consistent with the RFC) because she receives help from family invites the court to reweigh the evidence, which the court may not do.

Ms. Martinez also argues the ALJ wrongly found her exercising for 10-15 minutes as inconsistent with disabling symptoms because her cardiologist recommended she continue those exercises and opined she was disabled and unable to work, so the two are not inconsistent with

each other. (ECF #6 at PageID 656) (citing Tr. 623, 627, 543). Ms. Martinez's cardiologist did write, "For the time being due to her recurrent syncope she is unable to return to work. In my expert medical opinion she is unable to work and therefore was advised to apply for disability." (Tr. 543). In the context of whether a claimant is disabled under the Social Security Act, "Statements that you are or are not disabled" are "inherently neither valuable nor persuasive to the issue of whether a claimant is disabled." *See* 20 C.F.R. § 404.1520b(c), (c)(3)(i). This is because only the Commissioner may decide whether a claimant is disabled. *See Noe v. Comm'r of Soc. Sec.*, No. 26-5136, 2026 WL 3321660, at *2 (6th Cir. Nov. 3, 2026) (psychologist's letter that the claimant was "unable to maintain gainful and substantial employment" was "neither valuable nor persuasive because it addresses an issue reserved to the Commissioner.") (quotation omitted). Thus, the fact Ms. Martinez's cardiologist thought her symptoms were disabling despite recommending 10-15 minutes of daily exercise does not mean the ALJ cannot find that exercise inconsistent with disabling symptoms.

In sum, the ALJ compared Ms. Martinez's statements to the objective medical evidence and applied multiple regulatory factors, including her treatment, side effects, and daily activities and substantial evidence supports the ALJ's findings. I thus decline to order remand on this basis.

## Conclusion

After review of the record, the parties' arguments, and the law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: November 24, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE